# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

ELLIS ANDERSON, III,      )
                      )
      Plaintiff,     )
                      )
      v.               )     **Case No. 3:06-CV-0784**
                      )     **Judge Echols**
                      )
ASPLUNDH TREE EXPERT    )
COMPANY, INC.,        )
                      )
      Defendant.   )

## MEMORANDUM

Pending before the Court is the Motion for Summary Judgment (Docket Entry No. 18) filed by Defendant Asplundh Tree Expert Company, Inc. ("Asplundh"). Plaintiff, Ellis Anderson, III ("Anderson") has responded in opposition (Docket Entry No. 35), and Asplundh has replied (Docket Entry No. 42).

## I. FACTUAL BACKGROUND

Anderson is a former employee of Asplundh. He filed suit after he was demoted and subsequently terminated from his employment. He claims that he was discriminated against in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621. He also claims that he was retaliated against after he filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

Many of the facts are undisputed by the parties. The relevant facts are as follows. These facts will be expanded upon where necessary to the legal discussion.

1

**A. Background and Structure of Asplundh**

Asplundh, a family-owned company, is a utility contractor that performs vegetation management. As such, it clears trees and vegetation for utility companies.

Asplundh employs ground crew members who clear the trees and vegetation. A Foreman supervises three to four crew members. The Foreman reports to a General Foreman who supervises between one and fifteen Foremen. The General Foremen are assigned to specific customers and are responsible for overseeing the operations related to their customers.

General Foremen report to Supervisors. Supervisors are responsible for overseeing the operations and profitability of a small geographic area within a sales region and they generally supervise between six and seven General Foremen. Supervisors are expected to maintain good relationships with Asplundh's customers and to obtain new contracts.

Supervisors report to Regional Managers who are responsible for overseeing the operations, sales and profitability of a large geographical territory. Regional Managers report to Sponsors. Sponsors oversee the operations of several geographic sales territories.

Up until 2004, Region 67 included all of Tennessee except for Memphis, as well as a small portion of northern Mississippi and a small portion of western Virginia. Most regions have one large customer and a handful of small customers. However, Tennessee was different from the norm in that there were more than 60 small utility companies that were potential customers.

In addition to numbered geographic sales regions, Asplundh has an Outsourcing Region, which, at any given time, has consisted of from 300 to 500 crew members. Crews assigned to the Outsourcing Region were not assigned to a specific geographic area as were the crews assigned to a specific Region. Instead, crews from the Outsourcing Region traveled around the country performing emergency and storm work, as well as excess work within a specific Region. Thus, if a Regional

2

Manager determined that he did not have enough crews to perform a certain job, the work could be assigned to the Outsourcing Region crews. A portion of the profit earned by the Outsourcing Region crews was attributed to the Regional Manager for the region in which the work was performed.

Prior to 2001, several of Asplundh's Regional Managers were allowed to manage underground construction crews. However, Asplundh decided to consolidate all of its underground construction crews under the management of an individual with construction experience. Asplundh created a new construction subsidiary under a Construction Manager and consolidated all of its underground construction crews under his management. Thereafter, no Regional Managers in the Vegetation Division was responsible for overseeing underground construction crews after the consolidation, although a portion of the profits was dispersed to the accounts of the Regional Manager where the work was performed.

## B. Plaintiff's Employment with the Company

Anderson began working for Asplundh in June 1975 as a ground crew member. Throughout his 30 years of employment with Asplundh, Anderson was in the Vegetation Management Division and held various positions.

In January 2000, Steven Asplundh, a Sponsor/Vice President in the Vegetation Management Division, promoted Anderson, who was then approximately 45 years old, to Regional Manager of Region 67, after Bill Starks ("Starks") retired. At the time, Anderson was a Supervisor under Starks.

With his promotion, Anderson was responsible for overseeing the overall operations, sales and profitability of Region 67. Steven Asplundh was Anderson's Sponsor. Anderson claims that early in his tenure as Regional Manager, Steven Asplundh forced him to fire two older employees because, as Steve Asplundh allegedly said, they "were too old, had been around too long."

3

Asplundh claims that Region 67 struggled under Anderson's management. According to Asplundh, several customers in Region 67 canceled contracts during the course of Anderson's tenure as Regional Manager for Region 67. Moreover, Region 67's profits plummeted. Region 67's profits were $852,234.00 in 2001. By 2003, profits were $339,477.00. In 2004, the profits dropped to $193,549.00.

Anderson does not dispute that, at least on paper, Region 67's profits dramatically declined.[1] He does however provide explanations for that decline and suggests that some of the lower figures were due to how profits came to be calculated.

Anderson had underground or construction crews working under him in his region and his region earned profit on that work. However, when those crews were reassigned in 2001 he lost the profit that those crews would have garnered in the future years.

Further, in the early part of the decade, utility companies in the area began changing the way they bid work for vegetation management. Instead of taking bids based upon time and material, the utility companies wanted circuit bids, mile bids, or other such bid modules. The reason for the change in bidding practices was to save money for utility companies by decreasing the costs for vegetation management. These changes in bidding policies and practices by the utility affected vegetation control contractors throughout Tennessee.

Anderson claims that he recognized the industry trend towards module bidding as opposed to time and material bidding and for this reason started outsourcing work by utilizing primarily Hispanic crews under the supervision of Juan Montero ("Montero"). These crews were very profitable

_____

[1]In an Affidavit, Anderson verifies these figures presented by Asplundh. However, while he admits that his total regional sales for 2004 were $193,549.00, he claims that this figure did not include credit for storm work done during that year and, had that been added, the total profit for the year would have been $491,398.44.

4

for Region 67 in 2001 and 2002. However, Montero transferred to the Outsourcing Region in June 2002 and took his crews with him. This led to a decline in profits for subsequent years.

As for the low figure in 2004, Anderson explains that this did not include storm work done in 2004. Had that been included, the total profit would have jumped from $193,549.00 to $491,398.44. Moreover, Anderson claims that he was instructed to bid on a Virginia Department of Transportation contract at no profit and that he was required to spend approximately $250,000.00 on equipment for that project.[2]

Anderson also claims that he was hampered in the bidding process. This was because before his bids were sent out they had to be approved by Steve or Matt Asplundh.

In any event, in August or September 2004, Asplundh's Executive Committee decided to re-organize Region 67 as it had other regions when they experienced a decrease in profits. Generally, when a Region suffers decreasing profits, the Executive Committee steps in and re-organizes the region by changing the Sponsor assigned to the region, splitting up the geographic territory in the region, and/or changing the Regional Manager assigned to the Region.

With respect to Region 67, Asplundh changed its Sponsor by replacing Steven Asplundh with Matt Asplundh. The geographical sales territory of Region 67 was also split and Region 67 was eliminated as an independent sales region.

With the changes relating to Region 67, Anderson's Regional Manager position was eliminated in September 2004. Thereafter, Asplundh did not employ any one Regional Manager who was responsible for the geographic territory of Tennessee. Rather, Asplundh split the geographic

---

[2]Asplundh claims that it was unaware of this contention and that, in any event, items purchased for a specific project are amortized over a period of two to ten years. Hence if, in fact, $250,000 was spent on equipment that full amount would not be reduced from the region's profit in one lump sum.

territory of Tennessee in half and combined each half with territory in other regions to create two new geographic sales regions. Thus, the western half of Tennessee was combined with the old Region 36 and now included western Tennessee and Arkansas and was called Region 136/36. The eastern half of Tennessee was combined with the geographic territory in northern Alabama which had been Region 52. That new geographic region was called 167/67.

Jason Coccodrilli ("Coccodrilli") became the Regional Manager of Region 136/36. Immediately before, Coccodrilli was the Regional Manager of Region 36. Coccodrilli had been employed by Asplundh since February 1995 and was promoted to Regional Manager of former Region 36 in June 2004. Randy Parham ("Parham") became the Regional Manager of Region 167/67. At the time, Parham had been selected to be the Regional Manager for Northern Alabama when the former Regional Manager was made a Sponsor.

With the realignment of Region 67, Anderson lost his position as Regional Manager. He was offered, and accepted, a position as a Supervisor in Region 136/36. He received the same salary as he had as a Regional Manager and was allowed to keep a company car.

After his demotion, Anderson complained to the Human Resources Department at Asplundh. On January 24, 2005, he filed an EEOC charge alleging age discrimination. Anderson claims that after he filed the EEOC charge he was subjected to retaliation in various forms.

As a Supervisor, Anderson worked in Nashville, Tennessee. He was responsible for the profitability and operations related to Nashville Electric Service ("NES"), the largest customer in Middle Tennessee, and other smaller customers. The NES contract was large enough that more than half of Asplundh's local crew was assigned to NES work.

Up until March 2005, Anderson reported to Coccodrilli, when Coccodrilli accepted a transfer to Pennsylvania. Coccodrilli was replaced by Tim Manners, who was 47 years old at the time, and had worked for Asplundh for more than twenty-five years.[3]

In April 2005, NES gave Asplundh a thirty-day notice that it was canceling the contract it had with NES. According to Manners, he spoke with Anderson and Anderson maintained that the contract would not be cancelled because of his personal relationship with NES personnel. Because Manners knew that a loss of the NES contract would lead to a mass lay-off, he told Anderson to meet with his contact at NES. Manners claims that Anderson admitted that he waited three weeks to contact anyone at NES and by then it was too late.

The loss of NES critically affected Asplundh's Nashville operation since NES provided more than half the work for Asplundh's Nashville operation. Nearly forty employees were laid off in June 2005. Asplundh claims that with the significant reduction in force there was no longer enough crew members in Tennessee to support a Supervisor. Matt Asplundh decided to eliminate Anderson's position.

In May 2005, Manners informed Anderson, along with nearly forty other employees, they would be laid off in June 2005. Manners assumed Anderson's previous duties as a Supervisor in addition to his own responsibilities as Regional Manager. Asplundh did not employ a Supervisor in Middle Tennessee after June 2005. Anderson filed a second charge of discrimination with the EEOC

_____

[3]During this time period, Asplundh employed forty-six Regional Managers. All but five were over the age of forty. Twenty-two were forty-nine (the same age as Anderson) or older. Between 2003 and 2005, Asplundh promoted fourteen individuals over the age of forty to the position of Regional Manager. Nine of these individuals were the same age or older than Anderson.

7

on May 19, 2005, claiming his position was being terminated in response to his having filed an earlier charge.

Efforts to find Anderson another position with Asplundh failed. Manners claimed he tried to get Anderson a Safety Supervisor position. Anderson was required to file an application for the position but he was not given that position and the record does not reflect that there were any open Safety Supervisor positions at that time. Manners claims that he also considered replacing two General Foremen, Joe Cartwright ("Cartwright") and Jimmy Eaves ("Eaves") with Anderson, but elected not to do so after hearing from customers that they were satisfied with the performance of Cartwright and Eaves.

On June 10, 2005, Anderson's employment with Asplundh was terminated. At the time, Anderson was fifty years old. Subsequently, Asplundh closed its office in Nashville and sold off its local property.[4]

On January 25, 2006, Plaintiff filed his third EEOC claim, alleging that his discharge was due to his age and was in retaliation for having filed the two previous EEOC charges. This lawsuit followed.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be

---

[4]It is not clear from the record exactly when this occurred.

8

addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW

#### A. Age Discrimination

Under the ADEA, a plaintiff seeking to establish a claim of age discrimination must first prove a *prima facie* case of discrimination. Manzer v. Diamond Shamrock Chemical Co., 29 F.3d 1078, 1081–84 (6th Cir. 1994) (ADEA case applying McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) as later refined by Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981)). An employee "may establish a *prima facie* case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, or by showing the existence of facts which create an inference of discrimination." Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1248 (6th Cir. 1995) (internal citations omitted). Where no direct evidence of discrimination is available, the

9

plaintiff may establish his *prima facie* case of age discrimination with indirect, circumstantial evidence by showing that (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the particular position; and (4) he was replaced by or treated differently from a similarly situated but significantly younger person or, in a failure-to-hire case, the successful applicant was a substantially younger person. <u>McDonnell Douglas</u>, 411 U.S. at 902; <u>Grosjean v. First Energy Corp.</u>, 349 F.3d 332, 340 (6th Cir. 2003); <u>Godfredson v. Hess & Clark, Inc.</u>, 173 F.3d 365, 371 (6th Cir. 1999).

The fourth element, however, is modified when the adverse employment action was the result of a reduction in force, because the plaintiff is not actually replaced. "Instead, the plaintiff must present 'additional direct, circumstantial or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" <u>Godfredson</u>, 173 F.3d at 371 (quoting <u>Scott v. Goodyear Tire & Rubber Co.</u>, 160 F.3d 1121, 1126 (6th Cir. 1998)).

If the plaintiff establishes a *prima facie* case, then the burden shifts back to the defendant/employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." <u>Burdine</u>, 450 U.S. at 253 (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802). If the defendant carries that burden, then the plaintiff must prove that the proffered reasons are pretextual. <u>Id.</u>, 450 U.S. at 253 (citing <u>McDonnell Douglas</u>, 411 U.S. at 804). In order to show that a proffered legitimate, non-discriminatory reason for an adverse employment action is pretextual, a plaintiff must show "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." <u>Manzer</u>, 29 F.3d at 1084 (citation omitted).

In this case, while Anderson discusses the direct versus indirect methods of establishing a *prima facie* case in his brief, he never really identifies any direct evidence of discrimination. The

10

closest he comes is by referencing Steven Asplundh's alleged statement that Anderson needed to fire two employees who "were too old, had been around too long." Even assuming the statement was made, it does not establish direct evidence of discrimination.

"Direct evidence generally cannot be based on isolated and ambiguous remarks." DiCarlo v. Potter, 358 F.3d 408, 416 (6th Cir. 2004). However, "when made by an individual with decision-making authority such remarks become relevant in determining whether there is enough evidence to establish discrimination." Id.

In this case, the ultimate decision-maker with respect to Anderson's demotion and subsequent termination was Matt Asplundh, not Steven Asplundh. "[A]n isolated discriminatory remark made by one with no managerial authority over the challenged personnel decision is not considered indicative of age discrimination." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 354 (6th Cir. 1998).

Yet even if it could be shown that Steve Asplundh had some influence in the employment decisions relating to Anderson, the statements would still not constitute direct evidence of discrimination. The record reflects that the statements were allegedly made shortly after Anderson was promoted to Regional Manager, which would have been several years before his demotion and subsequent termination. This is insufficient to establish a direct nexus between the alleged statement and subsequent adverse employment actions. See, Hussain v. Highgate Hotels, Inc., 2005 WL 627964 at *4 (6th Cir. 2005)(derogatory comment made seven months before termination insufficient direct evidence to establish causation); Suits v. The Heil Co., 2006 WL 2221006 at *4 (6th Cir. 2006)(while remarks were not "stray" or "innocuous," they nevertheless could not constitute adequate direct evidence of animus where they were made up to three months before the adverse action); Letcher v. Sharp Electronics Corp., 1996 WL 306553 at *3 (6th Cir. 1996)(no direct evidence where particular

11

comments were not related to the decision at hand or made in close temporal proximity to the adverse action).

Because Anderson has failed to advance direct evidence of discrimination, the Court turns to the circumstantial evidence in the record. This evidence shows that Anderson was a member of a protected class in that he was over forty years old; he suffered an adverse employment action in that he was demoted and later terminated; and he was qualified for both the position of Regional Manager and Supervisor, or at least a jury could so find. That leaves for consideration the fourth element of the *prima facie* case which is that Anderson was singled out for demotion and/or discharge for impermissible reasons.

Anderson does not present a jury question in relation to the fourth element of a *prima facie* case. With respect to his replacement as a Regional Manager in 2004, the record shows that Region 67 was subsumed by two other regions. The western portion of Tennessee was incorporated into the region which included Arkansas. The eastern portion of the region was incorporated into the northern Alabama region.

The consolidation of the regions was effectively a reduction in force ("RIF"). Under prevailing Sixth Circuit law, Anderson was not replaced when others assumed his job duties as a result of the restructuring. As the court in <u>Barnes v. GenCorp., Inc.</u>, 896 F.2d 1457, 1465 (6th CIr.1990) stated:

> A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.

12

Importantly, "[t]here is no requirement that a RIF involve terminations; a RIF merely requires that positions be eliminated. Wilson v. Ohio, 178 Fed. Appx. 457, 465 (6th Cir. 2006). Thus a RIF may occur where the company reorganizes and a plaintiff is demoted and not fired. Id.

"Under Barnes, [Anderson] was not replaced if (1) another employee was assigned to perform [Anderson's] former duties in addition to that employee's own duties; or (2) [Anderson's] former duties were redistributed among other existing employees." Id. citing, Barnes, 896 F.2d at 1465. That is exactly what occurred. Coccodrilli and Parham were assigned to perform Anderson's former duties. Regional 67 ceased to exist and therefore there was no Regional Manager for Region 67. As such Anderson fails to establish the fourth element of his *prima facie* case with respect to his demotion from Regional Manager.

Anderson also fails to establish the fourth element of his *prima facie* case with respect to his ultimate termination. The undisputed evidence shows that after Asplundh lost the NES contract, close to forty employees were laid off. The evidence also shows that there was no longer any need for a Supervisor in Nashville. Finally, the evidence shows that there never again was a Supervisor in Nashville and, in fact, the Nashville field office ultimately closed. Clearly, under the facts presented, Anderson was not replaced.

Ignoring the fact that his positions were eliminated, Anderson seeks to show dissimilarity in treatment between himself and one outside the protected class. In this regard, Anderson points to the fact that he was terminated but Jason Bray ("Bray"), a relatively new hire who was in his mid-thirties, was not. However, Bray is not a proper comparator.

Although "[e]xact correlation is not required," in order "[t]o be similarly situated, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without

13

such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Smith v. Leggett Wire Co., 220 F.3d 752, 762 (6th Cir. 2000). Bray was not similarly situated to Anderson. Bray was a General Foreman, not a Supervisor who earned a Regional Manager's salary. Anderson supervised the General Foremen and crews assigned to Nashville whereas Bray did not. In fact, Bray worked in Jackson, Tennessee and there is no evidence that the cancellation of the NES contract would impact his employment.[5]

Even if Anderson had established a *prima facie* case, however, Asplundh has articulated legitimate, non-discriminatory reasons for Anderson's demotion and subsequent discharge, and Anderson has not presented evidence suggesting that all of these reasons are pretextual. According to Asplundh, the profits in Region 67 plummeted while Anderson was at the helm and it has provided documentation to show a significant decline for that Region between 2001 and 2004.

After Region 67 had been divided and assigned to the adjacent Regions and Anderson had accepted a position of Supervisor in the new Region 136/36 with the same salary, he filed an EEOC charge alleging that he was demoted because of age discrimination. Anderson was allowed to remain in Nashville, and continued to be responsible for maintaining good relations with NES, the largest customer in Middle Tennessee which was responsible for more than one half of Asplundh's local work crew. Later, NES gave Asplundh a thirty day notice that it was canceling its contract. Manners, the new Regional Manager and Anderson's supervisor, asked him to meet with NES to try to salvage

_____

[5]Anderson notes that, even though he was an employee of some thirty years, he was required to submit a resume for vacant positions and even then he was not reassigned to another position. While that may be so, the ADEA "does not create an affirmative duty to retain older workers whenever a reduction in staff becomes necessary . . . [n]or was the ADEA intended to protect older workers from the often harsh economic realities of common business decisions and corporate reorganizations.'" Stipkala v. American Red Cross, 2000 WL 712378 *4 (6th Cir. May 23, 2000)(per curiam), citing Allen v. Diebold, Inc., 33 F.3d 674 (6th Cir. 1994); Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 517 (6th Cir. 1991)).

14

the NES contract in some way. Although this was a critical emergency which threatened a massive lay-off of crew members and the loss of significant revenue, Anderson, according to Manners, delayed three weeks before contacting NES to discuss the situation and to try to save the contract. Supposedly, Anderson had close relationships at NES. No one knows if Anderson's effort to save the important contract would have been successful, but Asplundh alleges he did not even make it a priority, even though the loss of the contract resulted in the lay-off of forty crew members.

Anderson has not shown Matt Asplundh did not have before him figures which showed a significant decrease in profits for Region 67 between 2001 and 2004. Instead, Anderson merely maintains that there were legitimate reasons for the decline and, with regard to 2004 while he had total regional sales of $193,549.00 that did not include storm work for which he was not given credit. He also does not dispute that the cancellation of the NES contract resulted in the termination of a significant number of the Nashville employees.

Merely claiming that the proffered reason provided by Defendant is insufficient to support the challenged action is not enough. Plaintiff "must take the extra step of presenting evidence to show that the reasons given are an attempt to cover up the employer's alleged real discriminatory motive." Grbchech v. Runyon, 245 F. 547, 552 (6th Cir. 2001). Moreover, it is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance or the performance of others. Coulter v. Deloitte Consulting, LLC, 79 Fed. Appx. 864, 868 (6th Cir. 2003).

Plaintiff "must allege more than a dispute over the facts upon which his discharge was based." Braithwaite v. Timken Co., 248 F.3d 488, 494 (6th Cir. 2001). The "'key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" Id. (citation omitted). "If there is no material dispute that the employer made a 'reasonably

15

informed and considered decision' that demonstrates an 'honest belief' in the proffered employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual." Id.

Here, the evidence in the summary judgment record shows that Asplundh made "a reasonably informed and considered decision" in deciding to consolidate Region 67 with the adjacent Regions and later to terminate Anderson's employment after the NES contract was cancelled and there was a huge lay-off of employees because of the loss of work. While that left a long-term employee without a job, neither this Court nor a jury can "examine an employer's reasons for discharge and determine that the employer's business judgment or policies do not appeal to its sensibilities." Brocklehurst v. PPG Indus. Inc., 123 F.3d 890, 898 (6th Cir. 1997).

Apparently in an effort to show pretext, Anderson has submitted affidavits from employees of former utility customers of Asplundh which generally indicate that Anderson was a responsible and reliable representative of Asplundh. While that may be true, it does not account for an overall decrease in profits over the years, or the loss of customers, including NES. See, Kaufmann v. GMAC Mortgage, 2007 WL 1933913 at *5 (3d Cir. 2007)(plaintiff must present evidence which suggests that each reason offered by the employer for the adverse action "was a fabrication"); Sher v. U.S. Dept. of Veterans Affairs, 488 F.3d 489, 507 (7th Cir. 2007)("Importantly, when an employer offers multiple legitimate, nondiscriminatory reasons for an adverse employment action, a plaintiff generally must offer evidence to counter each reason"); Champ v. Calhoun County Emergency Management, 266 Fed. Appx. 908, 913 (11th Cir. 2007)("Where multiple reasons are advanced, the plaintiff must show that each reason was pretextual").

Anderson also claims that he was subjected to dissimilar treatment because he was not given another job with Asplundh when it decided to reduce operations in Nashville. However, the law is

16

clear that in a RIF an employer is not required to create a new position or transfer an employee subject to a workforce reduction.  Bender v. Hecht's Dept. Stores, 455 F.3d 612, 622 (6th Cir. 2006).  Nor is an employer required to offer a lower-level position even if the employee is qualified to perform it.  Nobuta v. Loctite Corp., 1 Fed. Appx. 305, 315 (6th Cir. 2001).   While Anderson claims he should have been placed in a Security Supervisor position, he has not established that any such position was available at the time of his termination.  See, Bender, 455 F.3d at 622 (employer is not required to open a position or hold on to an employee in the hopes that a position will open in a RIF).  Further, while Anderson would have liked to take a General Foreman's position, those positions were filled and an employer is under no duty to transfer employees or displace workers when an employee's position is eliminated.  Barnes., 896 F.2d at 1469.

Whether analyzed as a direct or indirect evidence case, Anderson cannot show that Asplundh discriminated against him when he was demoted and subsequently terminated from employment.  Accordingly, Asplundh is entitled to summary judgment on Anderson's age discrimination claim.

**B.  Retaliation Claims**

The general framework for analyzing a retaliation case is as follows.  Plaintiff must establish a *prima facie* case of retaliation by showing: (1) he engaged in protected activity; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against him, or he was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action.  Morris v. Oldham County Fiscal Court, 201 F.3d 784, 791 (6th Cir. 2000)(emphasis omitted).  "If and when a plaintiff has established a *prima facie* case, the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions."  Id. at 792-93 (citation omitted).  "The plaintiff, who bears the burden of persuasion throughout the entire process,

17

then must demonstrate 'that the proffered reason was not the true reason for the employment decision.'" Id. at 793 (citation omitted).

In this case, the parties dispute the exact scope of Anderson's retaliation claim. In his second EEOC charge, Anderson alleged that he was being terminated in retaliation for having filed his first charge of discrimination. In his third EEOC charge, Anderson alleged that his termination was in fact a result of having filed earlier charges. His complaint in this Court only mentions retaliation in passing. Arguably, the Complaint can be read as suggesting that he was retaliated against when he was terminated and that he was retaliated against when he was not allowed to go to a supervisor's meeting.

Apparently in an effort to pin Anderson down as to the scope of his retaliation claim, he was asked numerous questions during his deposition about what he believed were the retaliatory acts by Asplundh. That questioning revealed that he believed he was retaliated against because (1) he did not receive a laptop computer to do his work; (2) his car was not traded-in; (3) he was not afforded the opportunity to take Bray's place or a General Foreman's place and he was lied to about the situation, and (4) he was not allowed to attend a supervisor's meeting.

Subsequently, in response to Asplundh's Motion for Summary Judgment, Anderson submitted an affidavit in which he lists numerous additional claims of retaliation. In his affidavit, Anderson claims that Asplundh engaged in retaliation by refusing his request for a laptop to help him work more efficiently, while other supervisors were given laptops; refusing to trade his vehicle when the expiration period had passed and his car was experiencing mechanical problems; refusing to allow him to attend the annual supervisors' meeting by assigning him a project to complete, and then still refusing to allow him to attend even though he had completed the assigned project; refusing his requests for assistance in meeting with potential customers to solicit business; omitting him from

18

important meetings with area customers with whom he had established good working relationships over the years; requiring him to submit a resume for another position with Asplundh when he had worked for Asplundh for thirty years; informing a co-employee and customer that he had filed an EEOC charge; telling him that because five customers did not want him on their property, he could not be placed in a General Foreman's position, when—in fact—none of the customers had been contacted; telling him that another position was not available because that position was also going to be eliminated, when—in fact—it was not eliminated; and telling him that he had to be terminated because there was no work for him. Leaving aside that many of these alleged actions cannot rightfully be considered materially adverse and that some of the allegations are wholly conclusory, the Court concludes that these alleged actions should not be considered in light of Anderson's previous deposition testimony.

A party cannot create a factual issue by filing an affidavit after a motion for summary judgment has been made that directly contradicts his or her earlier testimony. <u>Reid v. Sears Roebuck & Co.</u>, 790 F.2d 453, 460 (6th Cir. 1986). "If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue." <u>Aerel, S.R.L. v. PCC Airfoils, L.L.C.</u>, 448 F.3d 899, 908 (6th Cir. 2006)(citation omitted). To make this determination, the court should consider such things as "whether the affiant was cross-examined during his earlier testimony, whether the affiant had pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence and whether the earlier testimony reflects confusion that the affiant attempts to explain." <u>Id</u>. at 909.

In this case, analysis of the foregoing factors leads this Court to conclude that insertion of numerous other events which Anderson claims to be retaliatory is an attempt to create a sham issue

of fact.  While Anderson was not cross-examined in his deposition, he was exhaustively questioned about his retaliation claim.  He specified four areas where he believed retaliation occurred.  While Anderson did state that was everything he could remember at the time, he was specifically asked if there was anything which could prompt his memory and he responded "no."  The allegations he seeks to add are not "newly discovered."

> This conclusion is in keeping with the discussion by the Sixth Circuit in <u>Aerel</u>:

> > The rule set forth in <u>Reid</u> is grounded on the sound proposition that a party should not be able to create a disputed issue of material fact where earlier testimony on that issue by the same party indicates that no such dispute exists[.]
> > This is a far cry, however, from preventing a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit. Such an affidavit fills a gap left open by the moving party and thus provides the district court with more information, rather than less, at the crucial summary judgment stage. Because the deponent is under no obligation to volunteer information not fairly sought by the questioner, we see no reason to apply <u>Reid</u> and its progeny to such a situation.

<u>Id</u>. at 907.  Here, Anderson was thoroughly questioned in his deposition about how he believed he was being retaliated against and was given ample opportunity to set forth the acts which he believed to be retaliatory.  His supplementation of those acts in his affidavit cannot be said to fill a gap which was left open in the deposition.  Accordingly, the Court turns to those events which Anderson claimed in his deposition were retaliatory.

> Anderson cannot establish a claim of retaliation based upon his termination from employment.  "To establish the causal connection that the fourth prong requires, the plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects."  <u>Abbott v. Crown Motor Co., Inc.</u>, 348 F.3d 537, 543 (6th Cir. 2003).  While Anderson's termination occurred

20

months after he filed his initial charge,[6] mere temporal proximity is not enough. Nguyen v. City of Cleveland, 229 F.3d 559, 566 (6th Cir. 2000). Moreover, Asplundh presented a legitimate non-retaliatory reason for the discharge – the halving of the Nashville operation – and Anderson has not shown that reason to be pretextual.

For similar reasons, Anderson's claim that he was subject to retaliation because he was let go while others were kept on fails. As already explained, Asplundh has shown that those who were kept on were dissimilar from Anderson, and indeed there never again was a Supervisor in Nashville inasmuch as the operation closed.

Anderson's other alleged acts of retaliation fail because he has not shown them to be "materially adverse." Under Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405 (2006), to be an "adverse employment action" it is not necessary that the action be some sort of "ultimate employment decision," such as hiring, granting leave, discharging, or demoting. Instead, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (citations and quotation marks omitted). The Court went on to note that it was "speaking of material adversity," because it "is important to separate significant from trivial harms." Id.

Applying this test to the facts before it, the Supreme Court in Burlington Northern concluded that the plaintiff who was suspended without pay for thirty-seven days had experienced retaliation, because, inter alia, a reasonable worker would be dissuaded from making a discrimination claim when

---

[6]The Court recognizes that Anderson filed another charge shortly before his termination. However, that charge was in response to his already having been informed that his employment was coming to an end. Asplundh merely followed through on what it said was going to occur and that could not be viewed as retaliation for having filed the second charge.

it meant surviving for thirty-seven days without pay and with no way of knowing when or if she would be reinstated. This remained so, even though the employee was eventually reinstated with backpay. Id. at 2417.

The remaining acts about which Anderson complains hardly rise to this level. While Anderson complains he was not provided a laptop, the record reflects that not all supervisors were given laptops and Anderson had a computer in his office. See, Michael v. Caterpillar Fin. Serv. Corp., 2007 WL 2176220 (6th Cir. 2007)(requiring that laptop be turned in was not materially adverse action under Burlington); citing Adair v. Charter County of Wayne, 452 F.3d 482, 490 (6th Cir. 2006)(requiring police officer to turn in pager not adverse action). The fact that Anderson's company car was not replaced cannot be viewed to be a "materially adverse" employment action inasmuch as Anderson does not allege he was ever without a company car and indeed the record reflects that he kept the company's Crown Victoria when he was demoted from Regional Manager to Supervisor, even though other Supervisors drove pickup trucks.

Finally, the Court concludes that Anderson has failed to show that he was subjected to retaliation because he was not allowed to attend a Supervisor's annual meeting. Anderson claims that this prohibition occurred after he was asked to re-ride the NES line by Manners and did so. Manners claims that he needed Anderson out in the field because at the time the region was struggling. Indeed, it was because of that situation that Manners himself did not attend the annual Supervisor's meeting. This is a legitimate non-discriminatory reason which Anderson does not show to be pretextual.

Moreover, Anderson has not shown that his inability to attend the Supervisor's meeting was a materially adverse event in light of what was occurring in his region. According to the Supreme Court in Burlington, in determining whether an action is adverse, "[c]ontext matters" because "'[t]he real social impact of workplace behavior often depends on a constellation of surrounding

22

circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'" Burlington Northern, 126 U.S. at 2415 (citation omitted). Thus, refusing to invite an employee to lunch may be a petty slight, whereas, refusing to allow employees to go to weekly training lunches which contribute "significantly" to the employee's professional advancement could amount to retaliation. Id.

Here, Manners has asserted that the annual Supervisor's meeting is an event where Supervisors learn about new company policy and are given the opportunity to network. Attendance at the meetings is not mandatory and does not affect a Supervisor's job, responsibilities, salary or benefits. Manners also claims that at the time of the March 2005 meeting, his region was struggling to survive and its "survival was simply more important than networking with peers." (Manners Depo. Docket Entry No. 35-6 at 16). Anderson does not challenge these assertions nor does he even suggest how being unable to attend the meeting impacted him. In the context of what was occurring, the Court simply cannot conclude that Anderson's inability to attend an event which he does not even characterize as important or necessary amounted to a materially adverse action.

In light of the foregoing, Asplundh will be granted summary judgment on Anderson's retaliation claims.

## IV. CONCLUSION

For the foregoing reasons, Asplundh's Motion for Summary Judgment (Docket Entry No. 18) will be granted and Andersons' claims of age discrimination and retaliation will be dismissed.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE